Steven M. Tindall (SBN 187862)
Jeffrey Kosbie (SBN 305424)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Tel.: (510) 350-9700
Fax: (510) 350-9701
smt@classlawgroup.com
jbk@classlawgroup.com

*Attorneys for Plaintiff John Doe*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>v.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY, a Ohio Corporation; and DOES 1-50.<br><br><br>                    Defendants. | Case No. 5:21-cv-02602-BLF<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:    Hon. Beth Labson Freeman<br>Magistrate Judge: Hon. Nathanael M. Cousins<br><br>Date: August 24, 2023<br>Time: 9:00 am<br>Location: Courtroom 1, 5th Floor |

---

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................ 1

**STATEMENT OF FACTS** ................................................................................. 1

I.    Plaintiff Is a Sought-After Hire at Progressive ................................... 1

II.   Plaintiff Is a Valued Employee Prior to Announcing His Transition ................................ 2

III   After Announcing His Intent to Transition, Plaintiff Is Subjected to Increased Scrutiny ................................................................................. 3

IV.  Plaintiff Is Denied the Ability to Control How He Discloses His Gender Transition to His Teammates ........................................................ 4

V.   Following His Forced Outing, Plaintiff Continues to Face Increased Scrutiny ................ 6

VI.  Plaintiff Is Passed Over for a Promotion ......................................... 7

VII. Plaintiff Gets a Temporary Respite After Transferring to Modesto ................... 7

VIII. Plaintiff Is Transferred to the Gilroy Office Against His Will ................. 8

IX.  Ms. Guerrera Scrutinizes Plaintiff's Medical Care ............................. 9

X.   Ongoing Harassment Exacerbates Plaintiff's PTSD ............................ 9

XI.  Plaintiff Suffers Retaliation After Filing Complaints .......................... 10

XII. Plaintiff's Name Is Never Changed on His Progressive Email ................... 12

XIII. Plaintiff Excels Doing the Same Work for Another Insurer ................... 12

**ARGUMENT** ................................................................................................... 12

I.    The Court Should Deny Summary Judgment on Plaintiff's Harassment Claim ................ 12

    A.  Courts Analyze Harassing Conduct Collectively to Assess Its Severity and Pervasiveness ........................................... 13

    B.  There Are Triable Issues of Fact Whether Progressive's Conduct Was Severe or Pervasive ................................................. 14

II.   The Court Should Deny Summary Judgment on Plaintiff's Discrimination Claim. .......... 19

    A.  There Is Ample Evidence to Support a Finding of Adverse Employment Action ...... 19

**TABLE OF CONTENTS**

B.    Plaintiff Meets the Minimal Burden for Raising a Triable Issue of Fact as to Progressive's  Discriminatory Motive .......................................................................... 22

III.  Plaintiff Has Established a Prima Facie Case of Retaliation, and Progressive Has Failed to Provide a Legitimate, Non-retaliatory Reason for Its Actions ....................................... 24

**CONCLUSION**.................................................................................................................... 25

i

**TABLE OF CONTENTS**

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages(s)**

*Adetuyi v. City & Cnty. of San Francisco*,
   63 F. Supp. 3d 1073 (N.D. Cal. 2014)...................................................... 14

*Akers v. Cnty. of San Diego*,
   95 Cal. App. 4th 1441 (2002).......................................................... 18

*Alcala v. Best Buy Stores, LP*,
   2012 WL 6138332 (C.D. Cal. Nov. 7, 2012) .................................... 22, 25

*Chavez v. City of Los Angeles*,
   47 Cal. 4th 970 (2010)................................................................ 21

*Doe v. City of Detroit*,
   2018 WL 3434345 (E.D. Mich. July 17, 2018) ................................... 15

*Doe v. Triangle Doughnuts, LLC*,
   472 F. Supp. 3d 115 (E.D. Pa. 2020)............................................... 15

*EEOC v. Costco Wholesale Corp.*,
   903 F.3d 618 (7th Cir. 2018)................................................... 14, 17

*Eller v. Prince George's Cnty. Pub. Sch.*,
   580 F. Supp. 3d 154 (D. Md. 2022) ............................................... 19

*Emerick v. Regus Mgmt. Grp., LLC*,
   2020 WL 569299 (S.D. Cal. Feb. 5, 2020) ..................................... 22, 23

*Gathenji v. Autozoners, LLC*,
   703 F. Supp. 2d 1017 (E.D. Cal. 2010)............................................ 18

*Grimes v. Cnty. of Cook*,
   2022 WL 1641887 (N.D. Ill. May 24, 2022) .................................. 14, 17

*Harris v. Forklift Systems, Inc.*,
   510 U.S. 21 (1993) .................................................................. 13

*Johnson v. Advoc. Health & Hosps. Corp.*,
   892 F.3d 887 (7th Cir. 2018)...................................................... 14

*Josemite IV Inc. v. FedEx Ground Package Sys., Inc.*,
   2020 WL 1131234 (N.D. Cal. Mar. 9, 2020) .................................... 17

*Leglu v. Cnty. of Santa Clara*,
   2014 WL 4100599 (N.D. Cal. Aug. 20, 2014) ............................. 20, 22, 23

**TABLE OF AUTHORITIES**

*Leland v. City & Cnty. of San Francisco*,
576 F. Supp. 2d 1079 (N.D. Cal. 2008)..................................................................20, 25

*Lyle v. Warner Bros. Television Prods.*,
38 Cal. 4th 264 (2006) ....................................................................................................13

*Matvia v. Bald Head Island Mgmt., Inc.*,
259 F.3d 261 (4th Cir. 2001)..........................................................................................18

*Membreno v. Atlanta Rest. Partners, LLC*,
517 F. Supp. 3d 425 (D. Md. 2021) ..........................................................................14, 18

*Meriwether v. Trustees of Shawnee State Univ.*,
2019 WL 2392958 (S.D. Ohio Jan. 30, 2019)................................................................15

*Miller v. Dep't of Corr.*,
36 Cal. 4th 446 (2005) ....................................................................................................13

*Nicholson v. Hyannis Air. Serv.*,
580 F.3d 1116 (9th Cir. 2009) ........................................................................................23

*Ravel v. Hewlett-Packard Enter., Inc.*,
228 F. Supp. 3d 1086 (E.D. Cal. 2017)...........................................................................21

*Ray v. Henderson*,
217 F.3d 1234 (9th Cir. 2000).....................................................................................20, 25

*Rivas Rosado v. RadioShack, Inc.*,
312 F.3d 532 (1st Cir. 2002) ...........................................................................................18

*Roberts v. Clark Cnty. Sch. Dist.*,
215 F. Supp. 3d 1001 (D. Nev. 2016) .........................................................................14, 15

*Roby v. McKesson Corp.*,
47 Cal. 4th 686 (2009)......................................................................................................17

*Rumble v. Fairview Health Services*,
2015 WL 1197415 (D. Minn. Mar. 16, 2015) .................................................................15

*Sargent v. Litton Sys., Inc.*,
841 F. Supp. 956 (N.D. Cal. 1994).................................................................................21

*Swinton v. Potomac Corp.*,
270 F.3d 794 (9th Cir. 2001) ..........................................................................................10

*Taitt-Relf v. Olympus Corp. of Americas*,
2019 WL 4261059 (N.D. Cal. Sept. 9, 2019)..................................................................20

*Thomas v. Dep't of Corrections*,
77 Cal. App. 4th 507 (2000) ...........................................................................................18

**TABLE OF AUTHORITIES**

*Thompson v. Stanford Univ.*,
  2017 WL 7050673 (N.D. Cal. Nov. 3, 2017) ................................................................ 17

*Vincent v. BNSF Ry. Co.*,
  2012 WL 5929954 (E.D. Wash. Nov. 27, 2012) ...................................................... 22, 25

*Yanowitz v. L'Oreal USA, Inc.*,
  36 Cal. 4th 1028 (2005) ............................................................................................... *passim*

*Yartzoff v. Thomas*,
  809 F.2d 1371 (9th Cir. 1987) ......................................................................................... 25

**<u>Statutes</u>**

Cal. Gov. Code, § 12940, subd. (j) ........................................................................................ 13

**<u>Regulations</u>**

Cal. Code Regs. tit. 2 § 11034(h)(3) .................................................................................. 15, 21

**INTRODUCTION**

Plaintiff's claims arise from his experience working at Progressive Casualty Insurance Co. ("Progressive") in the two years after disclosing his identity as a transgender male to supervisors. Plaintiff alleges, and the evidence shows, that, during that time, he saw his authority and responsibility drastically reduced, was made to announce his gender transition at an office-wide meeting, was involuntarily transferred to a new location, was publicly "outed" to new co-workers, experienced scrutiny of his medical care, suffered multiple instances of misgendering, and was never given an e-mail address reflecting his male name—*among other things*.

Progressive's arguments for summary judgment reflects just a portion of the fact record. First, Progressive denies that Plaintiff endured any harassing behavior, and instead experienced only routine workplace disagreements. Second, it argues that there is no evidence of any adverse employment action or discrimination, while disregarding the many well-documented actions it took that a jury could find negatively impacted Plaintiff's job and reflected discriminatory animus. And third, Progressive fully ignores evidence that its supervisors treated Plaintiff poorly after he made formal complaints of harassment and discrimination. At every turn, Progressive's motion selectively reads both the record and well-settled California and federal law, which together compel that these disputed issues of fact be put properly before a jury. For these reasons, explained more fully below, the Court should deny Progressive's motion.

**STATEMENT OF FACTS**

**I.    Plaintiff Is a Sought-After Hire at Progressive.**

Plaintiff has worked in the insurance claim industry since 1998—his entire professional career—for various employers, including himself. Complaint ("Compl."), ¶ 10; Declaration of Jeffrey Kosbie ("Kosbie Decl.") Ex. I. Progressive valued this experience highly when preparing to make Plaintiff a job offer as a Managed Repair Representative (MRR) in Santa Clara County in 2014. For example, Michael Castagnetto, manager of Progressive's Santa Clara office who

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

had hiring authority over Plaintiff, wrote:[1] "[H]e was very professional in [his] interview, [he] enjoys claims and has the customer focus we're looking for. I think [he'll] be a great addition." Kosbie Decl. Ex. J; Deposition of Michael Castagnetto, Kosbie Decl. Ex. A ("Castagnetto Depo.") 28:7-9, 28:23-29:1, 29:18-25; Deposition of Jessette Porter, Kosbie Decl. Ex. B ("Porter Depo.") 45:3-24. Jessette Porter, an HR specialist who was preparing Plaintiff's salary recommendation (and who would have responsibility to act on any complaints that Plaintiff filed once he was hired), wrote: "[H]e has experience with at least 3 carriers, as an independent field rep, as well as a self-employed appraiser . . . I'm recommending we start out aggressive [with his] comp ratio." Porter Depo. 34:12-21, 46:18-20, 47:14-22. In addition to his work experience, Plaintiff holds (and held at the time of his hire) multiple auto repair-related certifications that are uncommon among MRRs at Progressive. Deposition of Rhonda Guerrera, Kosbie Decl. Ex. C ("Guerrera Depo.") 54:19-55:8; Plaintiff's Responses to Defendant's Interrogatories, Kosbie Decl. Ex. M ("Pl.'s Interrogatory Resp.") 5:3-4. Plaintiff was ultimately offered a $64,000 annual salary, with a comp ratio of 94.8 (the ratio of Plaintiff's salary compared to the midpoint of the salary range)—an uncommonly high figure at the time of Plaintiff's hiring. Porter Depo. 55:5-15, 57:1-6, 47:14-22, 53:20-54:4 (typical hiring comp ratio when Plaintiff was hired was 88.0).

## II.      Plaintiff Is a Valued Employee Prior to Announcing His Transition.

In his first four years at Progressive—that is, *before* announcing his intent to transition from female to male—Plaintiff was asked to assist in training new MRRs by conducting ride-alongs, where new MRRs would shadow Plaintiff, and he would answer their questions. *See* Declaration of Toria Thomas ("Thomas Decl.") ¶¶ 4, 5. One of Plaintiff's colleagues, Toria Thomas, states that her supervisor, T.J. Hargrove, told her that "she should continue asking Plaintiff questions [after completing a ride-along with him] about Progressive's policies and procedures, frame damage, suspension, and complex structural automobile repair." *Id.* ¶ 5. Mr.

---

[1] This brief refers to Plaintiff using his current pronouns. Some of the exhibits refer to Plaintiff with his prior pronouns, and the quoted language in the brief has been modified accordingly.

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

Hargrove also asked Plaintiff to present to his team on at least two occasions on issues related to vehicle frame repairs and suspension damage. *Id.* ¶ 8.

Plaintiff's annual evaluations during this time, including ratings on specific job objectives, were always either "above expectations" or "meets expectations." Kosbie Decl. Ex. K. Moreover, in April 2018 Plaintiff was honored as one of 250 Progressive employees selected to attend Major League Baseball's Opening Day at Progressive Field in Cleveland, Ohio—an internal Progressive competition tied to Progressive's philosophy as a company. Porter Depo. 81:7-82:6, 83:12-15, 83:19-22.

**III.    After Announcing His Intent to Transition, Plaintiff Is Subjected to Increased Scrutiny**

In May 2018, in conjunction with his gender affirming medical care, Plaintiff informed Avery Catabaran, his supervisor at the time (Plaintiff had transferred from working as an MRR to working in Fire and Theft), of his intent to transition. Deposition of Plaintiff, Kosbie Decl. Ex. D ("Pl.'s Depo") 54:13-15, 55:2-7. Following this disclosure, Mr. Catabaran began to scrutinize Plaintiff's work more often and took away Plaintiff's work from home arrangement, which had been in place since 2017 for medical reasons. *Id.* at 30:22-32:22, 56:9-12. Mr. Catabaran also began listening in on Plaintiff's phone calls—which he had not done before Plaintiff announced his intent to transition—explaining that he thought Plaintiff's voice was "a little aggressive." *Id.* at 68:2-25. In response to the increased scrutiny from Mr. Catabaran, Plaintiff requested a transfer back to his previous role as an MRR, in which he would be working in the field and have greater flexibility to manage his time. *Id.* at 30:19-31:4, 33:8-16, 34:5-22. Plaintiff's transfer was approved in June 2018, and he began working as an MRR with Mr. Hargrove as his supervisor. *Id.* at 36:23-37:4.

When he previously worked as an MRR in 2016, Plaintiff's authority level—the threshold he was allowed to approve for payments for a vehicle appraisal—was $10,000, the maximum authority level available for MRRs. Defendant's Responses to Plaintiff's Interrogatories, Kosbie Decl. Ex. L ("Def.'s Interrogatory Resp.") at 4; 30(b)(6) Deposition of Michael Castagnetto, Kosbie Decl. Ex. E ("Castagnetto 30(b)(6) Depo.") 20:10-12, 20:24-21:2.

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

1   When Plaintiff returned to working as an MRR, however, Mr. Hargrove set his authority level at

2   $5,000, lower than his previous authority and lower than other MRRs on Mr. Hargrove's team.

3   Pl.'s Depo. at 83:25-84:3; Def.'s Interrogatory Resp. at 4. Progressive concedes that there is no

4   documented reason for this reduction in Plaintiff's authority, and Plaintiff's authority level was

5   never returned to $10,000 for the remainder of his time working for Progressive. *Id.*; Castagnetto

6   30(b)(6) Depo. 26:6-13.; Pl's Depo. 79:12-24.

### IV.   Plaintiff Is Denied the Ability to Control How He Discloses His Gender Transition to His Teammates

9       Despite the increased scrutiny at work, Plaintiff continued with his transition-related

10  medical care leading up to gender-affirming surgery. As part of this process, in July 2018,

11  Plaintiff told Mr. Hargrove and Ms. Porter about his intent to transition. Pl's Depo. 56:16-24.

12  Mr. Hargrove told Plaintiff that he would need to publicly announce his transition before he

13  could use the men's restrooms at Progressive's offices. Pl's Depo. 92:4-25, 97:11-19. Although

14  Plaintiff reluctantly agreed to announce his transition to his team on a date proposed by Mr.

15  Hargrove (when a team meeting was already scheduled), Plaintiff felt that he had no real choice

16  in the matter but to do so. Pl's Depo. 93:5-10, 93:19-20, 95:7-15; Pl.'s Interrogatory Resp. at 7.

17       Around that time, Plaintiff took bereavement leave after his grandmother—whom he

18  supported as a caretaker—passed away. Pl.'s Depo. 184:12-14. While Plaintiff was on

19  bereavement leave, Mr. Hargrove called him to ask if he would still be publicly announcing his

20  transition to his team. On August 22, Mr. Hargrove reached out to Plaintiff to ask if he was

21  coming in for the next day's scheduled meeting. Pl's Depo. 183:23-184:15. When Plaintiff asked

22  that the meeting be postponed, Mr. Hargrove responded that they did not have much time. *Id.* at

23  184:8-18, 185:19-186:1. Feeling left without a choice, Plaintiff attended the meeting while on

24  bereavement leave. *Id.* at 185:19-186:1, 206:24-207:3; Pl.'s Interrogatory Resp. at 7.

25       The all-hands meeting where Plaintiff announced his transition had about 30 people

26  present—that is, "whoever was inside the Santa Clara office and everybody from the field as

27  well." Pl's Depo. 99:20-100:1; Castagnetto Depo. 44:19-23. These large meetings took place two

28  or three times per year, and many of the attendees were not Plaintiff's regular coworkers.

Castagnetto Depo. 44:19-23; Pl.'s Depo. 98:25-99:18. Given his feeling that he had no choice but to discuss highly personal matters in front of the large number of attendees, Plaintiff did not feel safe in the meeting, and another attendee said he looked uncomfortable with the meeting and conversation topics. Pl.'s Depo. 206:23-25; Thomas Decl. ¶ 13 ("Plaintiff appeared to me to be very uncomfortable with this meeting and conversations . . . and Mr. Hargrove and Mr. Castagnetto did not express support for him."). For example, Mr. Hargrove made Plaintiff talk about which restroom he would be using, with no explanation of why this topic was being discussed. Thomas Decl. ¶ 13.

Though a handful of co-workers expressed support for Plaintiff, some of the attendees appeared shocked by what was happening, and Plaintiff felt as though he had been "paraded in the office" and "put on display like an animal . . . from the time [he] walked into the room." Pl.'s Depo. 90:25-91:7, 107:2-8, 108:2-12. Others in the room were uncomfortable or appeared not to know how to react. Thomas Decl. ¶ 14. Ms. Thomas, another MRR who worked in the office for six years, could not recall another meeting where an individual MRR "was asked to speak to their co-workers regarding a personal issue." Thomas Decl. ¶¶ 3, 15. After this meeting, Plaintiff felt humiliated and used inconveniently distant restrooms instead of the men's restroom he was now entitled to use, so not to encounter his co-workers who knew of his transition. Pl.'s Depo. 85:8-17, 88:14-18, 90:8-15.

As Progressive points out, Plaintiff was at times more public about his transition. This evidence is consistent with the fact that Plaintiff was figuring out what he was willing to disclose about his identity and to whom and navigating workplace harassment regarding his gender transition at the same time. Plaintiff, however, disputes that he ever posted to social media about his transition prior to announcing it in the August 23, 2018, meeting, and he disputes saying that his grandmother would have wanted him to proceed with the meeting. Pl.'s Depo. 176:7-14, 186:13-18. The video that Plaintiff recorded—which was *only* intended for potential release to the LGBT Employee Resource Group within Progressive—was never distributed. Pl.'s Depo. 51:17-52:10, 53:4-13. Moreover, while Plaintiff does not dispute that he understood his supervisor to be attempting to follow Progressive's guidelines as to the specific steps and

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

timeline for a workplace transition, Plaintiff also testifies that he did not feel that following the guidelines resulted in non-discriminatory treatment as Plaintiff did not have a choice as to how to announce his transition, and he did not feel supported by his supervisor—both of which are inconsistent with Progressive's Workplace Transition Guidelines. Kosbie Decl. Ex. N at pp. 5, 11-12; 30(b)(6) Deposition of Marisa Afzali, Kosbie Decl. Ex. F ("Afzali 30(b)(6) Depo."), 45:13-15; Pl.'s Depo. 107:12-15, 162:17-24, 262:2-4.

**V.    Following His Forced Outing, Plaintiff Continues to Face Increased Scrutiny**

Shortly after the August 23 meeting, Mr. Hargrove issued verbal discipline to Plaintiff. Pl.'s Depo. 109:2-8. Specifically, only after Plaintiff announced his transition, Mr. Hargrove criticized Plaintiff for not completing all of his assignments. *Id.* However, Plaintiff disputes Mr. Hargrove's claim that this discipline was justified, explaining that Progressive had not properly configured his computer and as a result, he was unable to view some of the assignments. *Id.* at 103:23-104:10, 108:22-109:1. Despite Plaintiff's explanation of the problem with his computer, Mr. Hargrove continued to scrutinize Plaintiff's work, giving Plaintiff only one assignment per day (instead of his usual four to five) for two weeks and forcing Plaintiff to wait for Mr. Hargrove to approve his work. *Id.* at 105:17-23, 109:9-11, 188:25-189:3. On at least a couple of occasions, Mr. Hargrove texted Plaintiff while Plaintiff was at medical appointments to ask about his whereabouts, and Plaintiff's co-worker, Ms. Thomas, heard Mr. Hargrove misgender Plaintiff at least twice. *Id.* at 71:2-7, 72:9-73:5, 74:12-17; Thomas Decl. ¶¶ 16, 17. In addition, Plaintiff's 2018 Annual Evaluation included scores of 2.0 and 3.0—lower than his previous evaluations. Kosbie Decl. Ex. O.

Mr. Castagnetto also treated Plaintiff differently following the August 23 meeting. Thomas Decl. ¶ 16. While Mr. Castagnetto had previously relied on Plaintiff's input and experience in helping make repair decisions, Ms. Thomas states that after Plaintiff announced his transition, Ms. Thomas observed Mr. Castagnetto "dismiss[] Plaintiff's ideas" and "seem[] disinterested in what he had to say." *Id.* ¶16. Mr. Castagnetto also "started discounting I-Car training certifications," which Plaintiff had obtained and "which is a known standard in the Insurance industry." *Id.*

6

Because of the emotional distress he suffered from the ongoing harassment and discrimination, Plaintiff postponed a planned transition-related surgery in or around January 2020. Pl.'s Interrogatory Resp. at 13-14; Compl. ¶¶ 47-48. In addition, Plaintiff took a leave of absence at this time because of the emotional distress he was under. Pl.'s Depo. 156:25-157:4.

## VI.   Plaintiff Is Passed Over for a Promotion

In March 2019, shortly after returning from leave, Plaintiff applied for an open MRR Supervisor position. Ms. Porter described Plaintiff's application portfolio as well done, and she asked Plaintiff for permission to share it as a model with future applicants. Porter Depo. 80:14-24. During the interview, however, Mr. Castagnetto appeared disgusted at seeing Plaintiff in traditionally masculine attire for the first time, and Mr. Hargrove appeared unsupportive of Plaintiff. Pl.'s Depo. 117:19-118:19, 119:14-16 ("[H]e could barely look at me."). In contrast, when Plaintiff first interviewed for an MRR position (presenting as female), Mr. Castagnetto was warmly welcoming. *Id.* at 118:14-25, 119:5-11. While Plaintiff acknowledges that the person picked for the position instead of him was also qualified, Plaintiff disputes that that person was more qualified than Plaintiff and explains that she had fewer years of experience than Plaintiff. Pl.'s Depo. 262:10-17.

## VII.   Plaintiff Gets a Temporary Respite After Transferring to Modesto

In April 2019, because of the ongoing emotional distress he was experiencing, Plaintiff requested a transfer to the Modesto, California, office, where he could work with people who were unaware of his transition history. Pl.'s Depo. 121:4-122:16. Ms. Porter acknowledges that she understood that Plaintiff "wanted an opportunity for others to know him exclusively as [a] male," and told Plaintiff that she would work with HR to update Plaintiff's gender marker in the company records. Deposition of Jessette Porter Volume II, Kosbie Decl. Ex. G ("Porter Depo. Vol. II") 129:16-17, 130:8-10; Kosbie Decl. Ex. P. This transfer to Modesto offered Plaintiff a reprieve from the difficulties he had experienced since announcing his transition—he now had "great" interactions with his colleagues, who treated him respectfully and did not misgender him. Pl.'s Depo. 124:20-125:3. He recalls more natural interactions, including with his new manager

7

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

Brian Sonke, who appears to have been unaware of Plaintiff's transgender status. Pl.'s Depo. 125:1-126:6; Porter Depo. 105:17-106:5.

**VIII.   Plaintiff Is Transferred to the Gilroy Office Against His Will**

In September 2019, Plaintiff was informed that he would be transferred from Modesto back to Gilroy. Pl.'s Depo. 131:15-20. Not only did Plaintiff not request the transfer to Gilroy, he had specifically requested not to be placed under Rhonda Guerrera (who would be his supervisor after his transfer to Gilroy), but he was given no choice in the matter. *Id.* at 130:19-131:1, 133:1-5. Progressive treated Plaintiff differently from other employees by transferring him against his will: Progressive's 30(b)(6) witness testified that he is not aware of any other MRR being transferred from one regional office to another without requesting it. Castagnetto 30(b)(6) Depo. 29:7-10; *see also* Castagnetto Depo. 41:7-9. Moreover, there is no documentary record to show why Plaintiff was transferred. Castagnetto Depo. 41:19-21. To make matters worse, in discussing the transfer with Mr. Sonke, Ms. Guerrera appears to have disclosed Plaintiff's transgender status to Mr. Sonke. Pl.'s Depo. 128:1-11. After Mr. Sonke discussed the transfer with Ms. Guerrera, Mr. Sonke told his team that "she" (referring to Plaintiff) would soon be transferring to Gilroy. *Id.* at 127:19-22, 128:1-11, 129:18-23.

Before Plaintiff's arrival in Gilroy, Ms. Guerrera impermissibly disclosed his transgender status to at least one of Plaintiff's new colleagues. Declaration of Chris Newell ("Newell Decl.") ¶¶ 3, 6. Chris Newell, another MRR on Ms. Guerrera's team, recalls that Ms. Guerrera mentioned Plaintiff's "background" to him in "an unnecessary and suggestive way" and asked Mr. Newell whether he knew that Plaintiff had transitioned from female to male. Newell Decl. ¶ 6; Kosbie Decl. Ex. Q. Ms. Guerrera acknowledged that she never asked Plaintiff whether it was permissible to disclose his transition history to the Gilroy team. Guerrera Depo. 81:8-11, 81:18-21. Ms. Guerrera misgendered Plaintiff on at least two occasions. Pl.'s Depo. 146:5-21, 123:7-10; Guerrera Depo. 76:23-77:3. Fellow Gilroy MRR Mr. Newell reported to an internal investigator that Ms. Guerrera did not appear to consider this misgendering "a big deal." Kosbie Decl. Ex. Q. Mr. Newell recalls that when Ms. Guerrera was corrected for misgendering Plaintiff, Ms. Guerrera responded, "Yeah, whatever." Newell Decl. ¶ 7.

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

**IX.    Ms. Guerrera Scrutinizes Plaintiff's Medical Care**

While Plaintiff worked under Ms. Guerrera's supervision, she regularly scrutinized Plaintiff's medical care in a way that she did not scrutinize the care of his cisgender colleagues (*cisgender* is a term for people whose gender identity matches the sex that they were assigned at birth). For example, she reviewed Plaintiff's caseloads for days in which he took medical appointments and called Plaintiff on days he was to take medical leave to request he make changes to files. Pl.'s Depo. 141:9-15, 142:4-8. Ms. Guerrera also questioned the length of Plaintiff's medical appointments, and at one point told Ms. Porter in HR that Plaintiff had a lot of medical appointments and asked if there was something she needed to know. Pl.'s Depo. 202:8-10, 202:14-16, 134:5-15; Porter Depo. 107:12-19, 107:24-108:8; Kosbie Decl. Ex. Q (Mr. Newell perceived Ms. Guerrera as "not understanding where [Plaintiff] was coming from regarding his personal situation and why all of the different appointments were necessary"). In addition to her scrutiny of Plaintiff's medical care, Ms. Guerrera also scrutinized Plaintiff's work more than she did other employees. Newell Decl. ¶ 9; Guerrera Depo. 68:10-69:8.

In one incident, Ms. Guerrera confronted Plaintiff in front of two other employees about a request for make-up time related to Plaintiff's transition-related surgery. Pl.'s Depo. 146:22-147:15, 200:24-201:11. Plaintiff testified that Ms. Guerrera "lunge[d] at [him]" and "[he] had to step back," and Mr. Newell (who was there) states that "[he] could hear Ms. Guerrera asking about Plaintiff's personal medical appointments" and "Ms. Guerrera's body language and speech was agitated and aggressive during this conversation." Pl.'s Depo. 201:2-3; Newell Decl. ¶ 8.

**X.    Ongoing Harassment Exacerbates Plaintiff's PTSD**

As a result of the harassment he faced at work, Plaintiff experienced severe emotional distress—including depression, anxiety, and an exacerbation of a preexisting diagnosis of Post-Traumatic Stress Disorder (PTSD) that impacted all facets of his life. Pl.'s Interrogatory Resp. at 9. As a result of this harassment, Plaintiff suffered symptoms including dissociation, loss of memory, night terrors, feelings of worthlessness and helplessness, lack of energy, and inability to focus. *Id*. This emotional distress caused Plaintiff to postpone a planned transition-related surgery, perhaps indefinitely, opting instead for a less invasive procedure that would be less

9

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

disruptive to his emotional state. *Id.* at 13-14. During this time, Plaintiff regularly reported his experience of workplace harassment to his mental health providers, and his experience is memorialized in his therapists' notes. Kosbie Decl. Exs. R to U. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 808 (9th Cir. 2001) (plaintiff's statements to psychologists discussing workplace harassment are admissible under the medical statements hearsay exception). In addition, Plaintiff went on medical leave in January 2020 because of the emotional distress he was under, and he had to postpone the long-planned adoption of a child. Pl.'s Interrogatory Resp. at 9.

Plaintiff has designated one of his current treating psychologists, Alex Rivera, Psy.D., as a non-retained expert witness. Kosbie Decl., Ex. Z, Plaintiff's Designation of Experts ("Expert Designation"). Dr. Rivera is expected to testify that "Plaintiff's experience of workplace harassment and discrimination exacerbated his pre-existing diagnoses." *Id.* In a treatment summary, Dr. Rivera stated that "[w]hen [Plaintiff] recounts traumatic incidents as part of treatment, he often becomes tearful. These symptoms significantly affect his daily, interpersonal and workplace functioning." Kosbie Decl. Ex. V.

## XI. Plaintiff Suffers Retaliation After Filing Complaints

Plaintiff filed an internal, written complaint against Ms. Guerrera on October 2, 2019, for gender discrimination and hostile work environment, and on October 10, 2019, Plaintiff filed an EEOC charge against Progressive, of which Ms. Guerrera was made aware. Pl.'s Depo. 241:13-18, 254:22-255:1; Guerrera Depo. 113:8-15. Immediately after Plaintiff's October 2 complaint, Ms. Guerrera further increased her scrutiny of Plaintiff's work. Guerrera Depo. 73:6-22 (conceding that files from October 2019 show "greater scrutiny" of Plaintiff's work than files from September 2019).

Plaintiff requested a meeting with Mr. Castagnetto on October 21, 2019, to discuss his complaints about Ms. Guerrera. Pl.'s Depo. 243:15-20. Mr. Castagnetto, however, canceled the meeting immediately and asked "how dare [Plaintiff] make these allegations and drag everybody into this." Pl.'s Depo. 243:15-244:8, 246:7-247:13. Plaintiff then met with Mr. Castagnetto and Ms. Guerrera, on their request, for a "feedback session," where Mr. Castagnetto and Ms. Guerrera reviewed alleged problems with Plaintiff's work. Pl.'s Depo. 148:6-15. During the

feedback session, Plaintiff explained that Mr. Castagnetto had already approved some of the files that they questioned him about, and that the computer system was supposed to transfer information as to other files. Pl.'s Depo. 148:20-149:12.

Following these meetings, Ms. Guerrera's treatment of Plaintiff continued the same or worsened. In December 2019, she denied his request for a stepladder to inspect cars, which a previous supervisor had granted. Pl.'s Depo. 201:17-21; Guerrera Depo. 112:16-17; Kosbie Decl. Ex. W (internal Progressive documentation of Plaintiff's statement that a previous supervisor approved a ladder). She continued scrutinizing his files and his medical leave requests. Pl.'s Depo. 153:8-154:17, 257:4-11; Newell Decl. ¶ 9. And in one conversation in December 2019, Ms. Guerrera said that it would be ideal if Plaintiff could reschedule a doctor's appointment. Kosbie Decl. Ex. X. In addition, Plaintiff's 2019 annual evaluation, completed by Ms. Guerrera, had scores of 2.0 and 3.0—lower than his previous evaluations. Guerrera Depo. 93:20-94:11 (admitting that scores were lower).

The discriminatory nature of Plaintiff's evaluations by Mr. Hargrove and Ms. Guerrera is further reinforced by the fact that his 2020 evaluations—under a different supervisor who did not discriminate against him—returned to their previous levels of "meets expectations." Kosbie Decl. Ex. Y. The written comments on these evaluations said "your contributions to the team have been valuable . . . [y]ou are able to manage your own workload and will reach out to others who may need assistance." *Id.* In addition, other MRRs continued to rely on Plaintiff for his extensive knowledge of auto insurance claims and car repair during this time, despite Plaintiff's transfer to a new team. Newell Decl. ¶¶ 10, 11; Thomas Decl. ¶ 18.

Plaintiff filed an anonymous complaint via Progressive's complaint hotline in January 2020, while he was on leave, and another complaint in April 2020. Pl.'s Depo 246:2-6, 253:3-7. Like his previous complaints, these complaints both related to harassment and discrimination by Ms. Guerrera and Mr. Castagnetto. *Id.* And, as with his previous complaints, nothing changed as a result. While Plaintiff does not dispute Progressive's assertion that it conducted investigations of his complaints, he disputes the findings of Progressive's investigations.

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

**XII.    Plaintiff's Name Is Never Changed on His Progressive Email**

Every employee at Progressive had an email address with their name in it. However, Progressive never changed Plaintiff's email address following his transition to reflect his name change. 30(b)(6) Deposition of Jessette Porter, Kosbie Decl. Ex. H ("Porter 30(b)(6) Depo.") 99:15-22. Moreover, Progressive acknowledges that, under its company policies, an employee must legally change their name before Progressive will change their email address or their name in Progressive's HR systems. Afzali 30(b)(6) Depo, 48:8-49:11, 49:23-50:16. In May 2019, Plaintiff submitted documents to Progressive, including a new Social Security card, to update his name. Kosbie Decl. Ex. AA. While Plaintiff's name was updated in various Progressive HR systems as a result, his email address was never changed. *Id.*; Porter 30(b)(6) Depo. 95:6-96:13, 97:7-25, 99:15-22. This is because, prior to 2021, Progressive did not automatically change an employee's email address when an employee submitted name change documentation. Afzali 30(b)(6) Depo. 49:5-11 (explaining that since 2021, Progressive automatically updates an employee's email address based on their HR record).

**XIII.   Plaintiff Excels Doing the Same Work for Another Insurer**

As a result of the ongoing emotional distress and discrimination faced at Progressive, Plaintiff left the company on January 31, 2022. Plaintiff now works for another auto insurer as an Auto Appraiser, a role similar to his MRR position at Progressive. Pl.'s Interrogatory Resp. at 5-6. He was quickly ranked as one of the best Auto Appraisers within his local office. *Id.* Further, he has passed all three national reviews at his new job with a score of 100%, a rare accomplishment for which his supervisors praised him. *Id.* Plaintiff's new supervisor speaks highly of his work, and Plaintiff has been granted leave without the scrutiny he experienced at Progressive. *Id.*

**ARGUMENT**

**I.    The Court Should Deny Summary Judgment on Plaintiff's Harassment Claim.**

Progressive's challenge to Plaintiff's harassment claim lacks merit because it fails to consider the totality of Progressive's objectionable conduct in the two years following Plaintiff's disclosure of his gender identity and intended transition. Rather than address the full scope of the

12

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

hostile environment to which Plaintiff was subjected—which, as Progressive acknowledges, included its managers' repeated and improper disclosures of Plaintiff's transgender status, misgendering of Plaintiff, and interfering with his gender-affirming medical care—Progressive minimizes Plaintiff's complaints as "ordinary workplace tribulations and disagreements." Defendant's Motion for Summary Judgment ("Mot.") at 21, 22. Considering the full record of Progressive's objectionable conduct in the light most favorable to Plaintiff, a triable issue of fact exists as to whether Progressive subjected him to a hostile or abusive work environment based on his gender identity or status as a transgender person.

### A. Courts Analyze Harassing Conduct Collectively to Assess Its Severity and Pervasiveness.

California's Fair Employment and Housing Act ("FEHA") makes it unlawful "[f]or an employer . . . because of . . . gender identity [or] gender expression . . . to harass an employee." Cal. Gov. Code, § 12940, subd. (j). To prevail on a FEHA harassment claim, an employee "must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive." *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 462 (2005). To be actionable, the environment must be objectively hostile or abusive, as well as subjectively hostile or abusive to the employee. *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 284 (2006). This "can be determined only by looking at *all the circumstances*," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Miller*, 36 Cal. 4th at 462 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 21, 23 (1993)) (emphasis added). "The effect on the employee's well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm . . . may be taken into account, no single factor is required." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1052-53 (2005) (citing *Harris* at 21-23).

"Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury. In order to remove such a question from

the jury on summary judgment, [a] court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive." *Grimes v. Cnty. of Cook*, 2022 WL 1641887, at *9 (N.D. Ill. May 24, 2022) (quoting *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018)); *see also Adetuyi v. City & Cnty. of San Francisco*, 63 F. Supp. 3d 1073, 1092 (N.D. Cal. 2014) ("California courts apply the Title VII framework to claims brought under FEHA" and "frequently turn to federal authorities interpreting Title VII"). Further, courts analyze the complained-of conduct "as a whole" and "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Grimes*, 2022 WL 1641887, at *9 (quoting *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018)).

### B. There Are Triable Issues of Fact Whether Progressive's Conduct Was Severe or Pervasive.

Here, the record contains ample evidence to create a question of fact whether the complained-of conduct was sufficiently severe or pervasive to constitute a hostile work environment. This is not a case where an employee "simply did not like how his supervisors criticized his job performance or managed him," as Progressive argues. Mot. at 22. Rather, after announcing his transition at Progressive, Plaintiff was subjected to numerous objectively offensive and humiliating actions by his supervisors—several of which were wholly unrelated to his job duties or performance.

For example, Plaintiff's status as a transgender man was intentionally and repeatedly disclosed to his co-workers by Ms. Guerrera and Mr. Sonke against his wishes (Pl. Depo. 127:19-22, 128:1-11, 129:18-23; Newell Decl. ¶ 6), and despite Progressive's knowledge that Plaintiff wanted to work with co-workers who were unaware of his transition history (Porter Depo. Vol. II 129:16-17, 130:8-10). Courts have denied summary judgment on similar harassment claims where plaintiffs presented evidence that they were "purposely outed" as transgender to co-workers. *See, e.g., Membreno v. Atlanta Rest. Partners, LLC*, 517 F. Supp. 3d 425, 442 (D. Md. 2021); *see also Grimes*, 2022 WL 1641887, at *9 (disclosure that plaintiff was transgender "weighs heavily" in plaintiff's favor) (citing *Membreno*); *Roberts v. Clark Cnty. Sch.*

*Dist.*, 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016) (a reasonable person could find disclosure of transgender status to all co-workers severe enough to support harassment claim). The fact that *some* of Plaintiff's co-workers may have already known of his transition history does not excuse the further disclosure of that personal information. *See Doe v. City of Detroit*, 2018 WL 3434345, at *2 (E.D. Mich. July 17, 2018) (reasoning that the fact that some of plaintiff's coworkers were aware of her transgender status and transition history did not reduce her interest in preventing further disclosure of her identity); *Meriwether v. Trustees of Shawnee State Univ.*, 2019 WL 2392958, at *4 (S.D. Ohio Jan. 30, 2019) ("there continues to be a serious social stigma associated with transgender identity with the potential for harmful repercussions").

Plaintiff has also produced evidence of at least five instances where he was misgendered as "she" or "her" by his supervisors. *See* Thomas Decl. ¶¶ 16, 17 (Hargove); Pl.'s Depo. 127:19-22, 128:1-11, 129:10-23, 130:4-9 (Sonke); Guerrera Depo. 76:23-77:3 (Guerrera); Kosbie Decl. Ex. Q (Guerrera); Newell Decl. ¶ 7. A reasonable jury could find that this, too, supports a finding of severe or pervasive conduct. *See Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (repeated misgendering supports hostile work environment claim). This misgendering, which a jury could find to be deliberate, can also be considered "objectively offensive behavior," *see Rumble v. Fairview Health Services*, 2015 WL 1197415, at *25-26 (D. Minn. Mar. 16, 2015), and is in fact prohibited by FEHA regulations requiring employers to identify transgender employees by their requested gender, name, and pronouns, *see* Cal. Code Regs. § 11034(h)(3).

A reasonable jury could also find that Progressive's forcing Plaintiff to announce his transition in front of an "all-hands" meeting—during his bereavement leave and when he was not comfortable doing so—supports a finding of severe or pervasive conduct creating a hostile work environment. Pl.'s Depo. 185:19-186:1, 206:24-207:3. Not only was Plaintiff deprived the opportunity to decide how, when, and to whom to announce this very personal news—in contravention of Progressive's Workplace Transition Guidelines (Kosbie Decl. Ex. N at p. 5; Afzali Depo. 45:13-15)—but Plaintiff was also made to feel unsafe, humiliated, and dehumanized by being "paraded around" in front of Progressive's entire Santa Clara team, some

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

of whom appeared uncomfortable or shocked (Pl.'s Depo. 90:25-91:7, 107:2-8, 108:2-12). And while *some* of Plaintiff's co-workers expressed support for Plaintiff, the testimony shows that many did not—*including* his supervisors Mr. Hargrove and Mr. Castagnetto. Thomas Decl. ¶¶ 13, 14. Thus, there is substantial evidence refuting Progressive's claim that Plaintiff's announcement was both "voluntary" and "well received"—to the contrary, evidence indicates that Plaintiff felt he had no choice but to publicly announce his transition and that this announcement shocked some co-workers and made many (including himself) uncomfortable.

Plaintiff's evidence also shows inappropriate scrutiny of his medical appointments throughout most of the two years following the disclosure of his transgender status—by *three* different supervisors: Mr. Catabaran (Pl.'s Dep. 30:22-32:22), Mr. Hargrove (*id.* at 71:2-7, 72:9-73:5, 74:12-17), and Ms. Guerrera (*id.* at 202:8-10, 202:14-16; Kosbie Decl. Ex. Q; Porter Depo. 107:12-19, 107:24-108:8). And testimony reflects that throughout Plaintiff's time working under Ms. Guerrera, she *regularly* interfered with Plaintiff's gender-affirming medical treatment, including by requesting he work instead of attend appointments (Pl.'s Depo. 142:16-24; Kosbie Decl. Ex. X), by scrutinizing his workload on days when he had medical appointment (Pl.'s Depo. 142:4-8), and by denying Plaintiff's requests to make up work hours so that he could attend his appointments without using medical leave (*id.* at 153:8-22). And it was during a disagreement over Plaintiff's make-up time request for transition-related surgery that Ms. Guerrera became aggressive with Plaintiff in front of his co-workers. Pl.'s Depo. at 146:22-147:19, 201:1-6, 204:4-6; Newell Decl. ¶ 8.

The record is also replete with evidence of Progressive's work-related actions that a jury could find contributed to an overall hostile atmosphere on account of Plaintiff's transgender status. This includes the chronic scrutiny of Plaintiff's work by his supervisors (Pl.'s Depo. 105:17-23, 109:9-11, 188:25-189:3; Newell Decl. ¶ 9; Guerrera Depo. 68:10-69:8); Progressive's failure to update Plaintiff's e-mail address to reflect his name change (Porter 30(b)(6) Depo. 99:15-22); Mr. Hargrove's drastic reduction of Plaintiff's work assignments following the disclosure of his transgender status (Pl.'s Depo. 105:17-23, 109:9-11, 188:25-189:3); Progressive's involuntary transfer of Plaintiff away from a work location where nobody

knew of his transition history to a supervisor and location he expressly requested *not* to be placed with (Pl.'s Depo. 130:19-131:1, 133:1-5); and the circumstances surrounding Plaintiff's interview for—and denial of—a promotion within the company (*Compare* Pl.'s Depo. 118:14-25, 119:5-11, *with* Pl.'s Depo. 117:19-118:19, 119:14-16). Progressive argues that these are "examples of common personnel management tasks that are outside the scope of actionable harassment" and pertinent only to discrimination claims. Mot. at 23. The law is clear, however, that "nothing in the FEHA requires that the evidence in a case be dedicated to one or the other claim but never to both." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 710 (2009); *see also Thompson v. Stanford Univ.*, 2017 WL 7050673, at *2 (N.D. Cal. Nov. 3, 2017) ("[A]lthough those two claims are distinct, they can 'overlap as an evidentiary matter.'") (quoting *Roby*, 47 Cal. 4th at 709). Thus, when "official employment actions" and "personnel actions" "also have a secondary effect of communicating a hostile message" they may properly "be the basis for a harassment claim." *Josemite IV Inc. v. FedEx Ground Package Sys., Inc.*, 2020 WL 1131234, at *4-5 (N.D. Cal. Mar. 9, 2020). Accordingly, Progressive's personnel actions against Plaintiff may also support a finding of severe or pervasive conduct for his harassment claim.

Taken together, as the Court must when evaluating their severity or pervasiveness, these actions hardly constitute "ordinary workplace tribulations and disagreements between members of the leadership team." Mot. at 22-23. Defendant's argument to the contrary ignores the substantial evidence of Progressive's conduct in response to Plaintiff's transition—his forced disclosure and discussion of his new identity and his bathroom use at an office-wide meeting, his involuntary outing by superiors at two different offices to which he had been transferred, and his supervisors' consistent (and often dismissive) misgendering of him throughout 2018 and 2019—any one of which alone constitutes evidence of severe conduct. And the pattern of conduct evidenced in the record, when viewed collectively, is more than sufficient to create a fact issue on the question of its pervasiveness. *See Grimes*, 2022 WL 1641887, at *9 (quoting *Costco Wholesale*, 903 F.3d at 626) (courts "should not carve up the incidents of harassment . . . to see if each rises to the level of being severe or pervasive"). Plaintiff's evidence shows objectionable and frequent harassing conduct by five supervisors (Mr. Catabaran, Mr. Hargrove, Mr.

Castagnetto, Mr. Sonke, and Ms. Guerrera) from 2018 to 2020—except for two months spent on a team unaware of his transgender status (before being "outed" by Ms. Guerrera and transferred to her territory). *See Membreno*, 517 F. Supp. 3d at 442 (reasonable factfinder could conclude conduct towards transgender employee was persistent when "[a]part from a select few supervisors and friends, and for a brief period when she worked at another [location] . . . [it] went unchecked").

Furthermore, the authorities cited by Progressive do not help its cause. Four out of five of its cases do not address "severe or pervasive" harassing conduct at all, but instead analyze various aspects of discrimination or retaliation claims. Mot. at 22 (citing *Rivas Rosado v. RadioShack, Inc.*, 312 F.3d 532, 534 (1st Cir. 2002) (company investigation of plaintiff's alleged workplace improprieties did not show "differential treatment" on basis of gender); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271-272 (4th Cir. 2001) (company's failure to address "uncivility of co-workers" is not an "adverse employment action" for retaliation claim); *Thomas v. Dep't of Corrections*, 77 Cal. App. 4th 507, 511-12 (delayed check and early job change are not "adverse employment actions" for retaliation claim); *Akers v. Cnty. of San Diego*, 95 Cal. App. 4th 1441, 1455 (2002) (defining "adverse employment action")). And the one relevant case that Progressive does cite, *Gathenji v. Autozoners, LLC*, 703 F. Supp. 2d 1017 (E.D. Cal. 2010), is easily distinguishable as involving only "conduct related to business and personnel management," such as demotion, staffing issues, and performance evaluations. *Id*. at 1034. Here, in contrast, Plaintiff was subjected to conduct including forced outing, misgendering, scrutiny of his medical appointments, and an unrequested transfer away from a team that was unaware of his transition history.

Lastly, Plaintiff's evidence shows that the pattern of harassment described above caused him significant and ongoing emotional distress with profound effects on his work and personal life, which is directly relevant to the inquiry into how severe and pervasive the harassing conduct was. *Yanowitz*, 36 Cal. 4th at 1052-53 ("psychological harm" or "effect on the employee's well-being . . . may be taken into account."). Plaintiff's experience of workplace harassment exacerbated a pre-existing PTSD diagnosis (Pl.'s Interrogatory Resp. at 9; Kosbie Decl. Ex. Z),

18

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

resulting in the postponement and modification of gender-affirming surgery (Pl.'s Interrogatory Resp. at 13-14), the indefinite delay of child adoption plans (*id.* at 9), and leaves of absence from work to cope with the emotional distress (*id.*). This evidence of Plaintiff's emotional distress resulting from Progressive's conduct further bolsters "a conclusion that the harassment was objectively severe or pervasive." *See Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 174 (D. Md. 2022).

## II.   The Court Should Deny Summary Judgment on Plaintiff's Discrimination Claim.

Progressive's challenge to Plaintiff's FEHA discrimination claims is also meritless. In his pleadings and throughout discovery, Plaintiff has consistently cited an array of conduct by Progressive that constitutes adverse employment actions, yet Progressive's motion considers only two of them. And whether considered collectively (as the law requires) or individually (as Progressive attempts), Progressive's actions meet the standard for actionable conduct, because they materially affected Plaintiff's employment at the company. In addition, Plaintiff has more than met his burden for showing a triable issue as to Progressive's discriminatory animus, which requires little evidence to put the question to a jury.

### A.   There Is Ample Evidence to Support a Finding of Adverse Employment Action.

Defendant fails to negate Plaintiff's evidence that he suffered multiple adverse employment actions. In addition to the reduction of his work authority by Mr. Hargrove and the denial of a job promotion—both of which constitute adverse employment actions—Plaintiff also identifies Defendant's intentional and uncorrected misuse of Plaintiff's gender pronouns, its failure to update Plaintiff's name in Defendant's email system, negative (and unwarranted) reviews of Plaintiff's job performance, and Plaintiff's involuntary transfer to Progressive's Gilroy location as other bases for finding adverse employment actions, none of which are addressed by Defendant.

California's Supreme Court has made clear that adverse employment actions need not be analyzed individually where a pattern of discrimination is alleged. *Yanowitz*, 36 Cal. 4th at 1056 ("Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of" the FEHA.). Instead, "it is appropriate . . . [to] consider

1   plaintiff's allegations collectively." *Id.*; *see also Leglu v. Cnty. of Santa Clara*, 2014 WL
2   4100599, at *7 (N.D. Cal. Aug. 20, 2014) (same) (citing *Yanowitz*); *Taitt-Relf v. Olympus Corp.*
3   *of Americas*, 2019 WL 4261059, at *3 (N.D. Cal. Sept. 9, 2019) (recognizing that "Plaintiff may
4   rely on the totality of the circumstances in asserting her claims"). Further, "[c]ourts define
5   'adverse action' broadly, finding that 'a wide array of disadvantageous changes in the workplace
6   constitute adverse employment actions.'" *Leglu*, 2014 WL 4100599, at *7 (quoting *Ray v.*
7   *Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)). And "any inquiry into an adverse employment
8   action considers 'the unique circumstances of the affected employee [and] the workplace context
9   of the claim.'" *Taitt-Relf*, 2019 WL 4261059, at *2 (quoting *Yanowitz*, 36 Cal. 4th at 1052).

10          Here, Plaintiff has raised and provided evidence of multiple actions that can qualify—
11   either individually or collectively—as adverse actions under FEHA. Progressive does not contest
12   (nor can it), that a failure to promote is an actionable adverse employment action if
13   discriminatory motive (discussed below) is shown. *Leland v. City & Cnty. of San Francisco*, 576
14   F. Supp. 2d 1079, 1097 (N.D. Cal. 2008) ("[I]t is well-established that a failure to promote is an
15   adverse action that materially affects the terms, conditions or privileges of employment.").

16          The same is true of a reassignment or transfer, even where it "did not change . . . pay,
17   benefits, or job classification," so long as it materially affected the work. *Id.* at 1098; *Leglu*, 2014
18   WL 4100599, at *8 (same). Here, the evidence shows that Progressive was aware that Plaintiff
19   sought a transfer to its Modesto branch in order to work with co-workers who were unaware of
20   his transgender status after Plaintiff suffered discrimination and harassment in Santa Clara
21   following his forced office announcement. *See* Pl. Depo. 122:5-10; Kosbie Decl. Ex. P; Porter
22   Depo. Vol. II 129:13-17. Despite this, Plaintiff was involuntarily transferred from Modesto back
23   to Santa Clara County (Gilroy specifically) within months, where Ms. Guerrera disclosed his
24   transgender status and subjected him to harassing conduct, increased scrutiny, and poor
25   treatment. *See* Pl.'s Depo 130:19-131:1, 133:1-5. Thus, Plaintiff's involuntary transfer alone
26   could reasonably qualify as materially adverse.

27          In addition, undisputed evidence establishes that Progressive never changed Plaintiff's
28   name in his e-mail address and required Plaintiff to submit a legal name change (as required by

20

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

Progressive's policies) prior to changing his name elsewhere in Progressive's systems, including its internal messaging system. Porter 30(b)(6) Depo. 95:6-96:13, 97:7-25, 99:15-22; Afzali 30(b)(6) Depo. 48:8-49:11, 49:23-50:16. Should a jury agree with Plaintiff, this failure would amount to a *per se* adverse action that "materially affect[s] the terms, conditions, or privileges of employment." This is because an employee's right to have their employer abide by their "preferred gender, name, and/or pronoun" (except where use of an employee's legal name is required to comply with a legally-mandated obligation) is specifically enumerated in the "Terms, Conditions, and Privileges of Employment" section of FEHA's implementing regulations—and an employer's failure to do so can be a basis for civil liability. *See* Cal. Code Regs. tit. 2 § 11034(h)(3); *see also Sargent v. Litton Sys., Inc.*, 841 F. Supp. 956, 960, n.3 (N.D. Cal. 1994) (accepting implementing regulations for the FEHA as binding); *Ravel v. Hewlett-Packard Enter., Inc.*, 228 F. Supp. 3d 1086, 1097 (E.D. Cal. 2017) (failure to comply with requirement under the FEHA's implementing regulations constituted adverse employment action). Even Progressive's act of requiring Plaintiff to obtain a new government ID and Social Security card reflecting a legal name change—with which Plaintiff complied—qualifies as an actionable, material change in the regulation's "terms, conditions, or privileges of employment" unless Progressive can prove that some exception applies.

Evidence indicates further that Mr. Hargrove reduced Plaintiff's authority level and work assignments following the disclosure of his gender transition. Progressive does not contend that these actions cannot qualify as adverse employment actions, only that these conditions were "temporary." Mot. at 26-27. But the evidence shows that, after Plaintiff disclosed his transition, his authority level was *never* restored to the maximum level he had in his first years working at Progressive. Def.'s Interrogatory Resp. at 4. In any event, there is no requirement that an employment condition be permanent to be an adverse action. *See Chavez v. City of Los Angeles*, 47 Cal. 4th 970, 990 (2010) (employee prevailed in FEHA retaliation claim for "temporary rescission of the order granting his transfer request"). Here, the evidence shows that Plaintiff's significantly reduced daily assignments were posted in the office where anyone could see and that his co-workers in fact asked him the reason for his reduced responsibility. Pl.'s Depo.

105:17-23, 109:9-11, 188:25-189:3. Accordingly, these too could reasonably qualify as adverse employment actions on which FEHA liability might be premised.

In sum, because each of the foregoing actions by Progressive could *on its own* qualify as a material change in the "terms, conditions, or privileges" of Plaintiff's employment, Plaintiff has met his burden on summary judgment to show that a reasonable factfinder could conclude the *totality* of that conduct resulted in an adverse employment action that is actionable under the FEHA. *See Yanowitz*, 36 Cal. 4th at 1055-56; *see also Leglu*, 2014 WL 4100599, at *7.

### B. Plaintiff Meets the Minimal Burden for Raising a Triable Issue of Fact as to Progressive's Discriminatory Motive.

While Progressive offers purportedly non-discriminatory reasons for two of the actions on which Plaintiff premises his FEHA discrimination claim (failure to promote and reduction in authority and work assignments), a reasonable jury could find Progressive failed to rebut the presumption of discrimination raised by Plaintiff or that Defendant's reasons were pretextual, *and* Progressive fails to offer legitimate explanations for the other adverse employment actions at issue—involuntarily transferring Plaintiff from Modesto to Gilroy and failing or refusing to change Plaintiff's name and e-mail address. Accordingly, "it is not necessary for the Court to address the additional steps in the *McDonnell Douglas* burden shifting analysis" and summary judgment should be denied as to those actions by Progressive to the extent they are found independently or together to constitute adverse employment actions. *Vincent v. BNSF Ry. Co.*, 2012 WL 5929954, at *13 (E.D. Wash. Nov. 27, 2012); *Alcala v. Best Buy Stores, LP*, 2012 WL 6138332, at *15 (C.D. Cal. Nov. 7, 2012).

As to Progressive's failure to promote Plaintiff, Progressive has failed to "rebut the . . . presumption of discrimination by articulating a legitimate, non-discriminatory reason for its actions" because its proffered reason relies on facts in dispute. *See Emerick v. Regus Mgmt. Grp., LLC*, 2020 WL 569299, at *9-10 (S.D. Cal. Feb. 5, 2020). In *Emerick*, the court denied summary judgment because plaintiff raised factual disputes that undercut the non-discriminatory justification offered by her employer: that she failed to report to work. *Id.* at *8-10. Here, there are factual disputes as to Progressive's justification that Audra Carrasco—who was promoted

over Plaintiff for the job in question despite being less experienced than Plaintiff—was "a more qualified internal candidate." Mot. at 28. None of the deposition testimony cited by Defendant references Ms. Carrasco's credentials for the job at all—only that she supposedly gave a better interview performance. *Id.* (citing Pl.'s Depo. 42:17-25; Castagnetto Depo. 39:12-40:4, 43:24-44:2). And although Plaintiff has admitted that Ms. Carrasco was also qualified for the job, Plaintiff's testimony establishes that Ms. Carrasco was not more qualified and that Plaintiff in fact had more years of experience. Pl.'s Depo. 262:10-17. Moreover, the evidence Progressive cites provides no support for its assertion that "Plaintiff admitted nothing about this interview was improper." Mot. at 30. In fact, Plaintiff testified that Mr. Castagnetto and Mr. Hargrove were "unsupportive" during the interview, and that Mr. Castagnetto appeared disgusted by Plaintiff's presence—and particularly his traditionally male business attire. Pl.'s Depo. 117:19-118:19, 119:14-16. Because these facts material to Progressive's purported non-discriminatory reasons for failing to promote Plaintiff are disputed, it has failed to "rebut the . . . presumption of discrimination," and its motion should be denied. *See Emerick*, 2020 WL 569299, at *9-10.

But even if Progressive has succeeded in shifting the burden to Plaintiff to establish Progressive's non-discriminatory reasons are pretextual, that burden is minimal at the summary judgment stage. "'[V]ery little evidence is necessary to raise a genuine issue of fact regarding an employer's motive,' as 'any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder.'" *Leglu*, 2014 WL 4100599, at *12 (quoting *Nicholson v. Hyannis Air. Serv.*, 580 F.3d 1116, 1127-28 (9th Cir. 2009)). As discussed above, the record provides substantial evidence that Plaintiff was singled out for different treatment on account of his gender identity and/or transgender status—including being involuntarily outed to his co-workers in both Modesto and Gilroy, being misgendered by supervisors, and, after disclosing his transition, having his medical care (including gender-affirming care) regularly scrutinized or interfered with.

The evidence also shows that Plaintiff's treatment changed markedly once he announced his transition. When Plaintiff applied to work at Progressive, the company considered him a strong candidate (Kosbie Decl. Ex. J; Porter Depo. 55:5-15, 57:1-6; 47:14-22), and Plaintiff

1  received favorable reviews and was asked to assist in training other employees because of his

2  extensive knowledge of the automotive industry (Thomas Decl. ¶¶ 4-5; Kosbie Decl. Ex. K) Yet

3  the evidence shows that shortly after disclosing his transition, Plaintiff's work was scrutinized,

4  his evaluations dropped, and his authority level was reduced. (Pl.'s Depo. 30:24-25, 105:17-23;

5  Thomas Decl. ¶ 16; Kosbie Decl. Ex. O; Guerrera Depo. 93:20-94:11).

6       Accordingly, Progressive has not proffered legitimate, non-discriminatory reasons for its

7  adverse actions, or there is at least a triable fact issue as to whether its reasons are pretextual.

8  **III.    Plaintiff Has Established a Prima Facie Case of Retaliation, and Progressive Has**

9  **Failed to Provide a Legitimate, Non-retaliatory Reason for Its Actions.**

10      As to Plaintiff's retaliation claim, Progressive is once again wrong that "the only adverse

11  action identified by Plaintiff was his failure to be promoted." Mot. at 29. When asked at his

12  deposition what specific retaliation he experienced, Plaintiff explained that, following Plaintiff's

13  written complaints to Progressive HR and the EEOC, Mr. Castagnetto refused to discuss

14  Plaintiff's workplace issues during a scheduled meeting and expressed anger that Plaintiff made

15  "these allegations and drag[ged] everybody into this." Pl.'s Depo. 243:15-244:8, 246:7-247:13.

16  Plaintiff also recalled a "feedback session" scheduled by Mr. Castagnetto and Ms. Guerrera,

17  where they raised unwarranted objections to Plaintiff's work. *Id.* at 148:6-15, 148:20-149:12.

18  Plaintiff testified that after his written complaints and those meetings, Ms. Guerrera's poor

19  treatment of Plaintiff persisted, and even worsened. For example, in December 2019, she denied

20  him a previously-approved accommodation for a stepladder. *Id.* at 201:17-21. She also increased

21  her scrutiny of his files, gave Plaintiff lower-than-usual scores in his 2019 annual evaluation, and

22  Ms. Guerrera herself conceded that files from October 2019 (shortly after Plaintiff's complaints)

23  showed "greater scrutiny" of Plaintiff's work than files from September 2019. Guerrera Depo.

24  73:6-22, 93:20-94:11; *see also* Newell Decl. ¶ 9. Ms. Guerrera also scrutinized Plaintiff's

25  medical leave requests, at one point saying it would be ideal if he could reschedule a doctor's

26  appointment. Kosbie Decl. Ex. X.

27      As with Plaintiff's discrimination claim, these actions should be considered

28  collectively—not individually—where a pattern of retaliation is alleged. *Yanowitz*, 36 Cal. 4th at

24

1055-56. Actionable retaliation includes "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." *Leland*, 576 F. Supp. 2d at 1097 (citing *Yanowitz*, 36 Cal. 4th at 1053-54).

Here, the record contains sufficient evidence of retaliation to survive summary judgment. Undeserved, negative performance ratings qualify as adverse employment actions under the FEHA. *See Leland*, 576 F. Supp. 2d at 1098 (citing *Ray*, 217 F.3d at 1241); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Moreover, courts will find a pattern of actionable retaliation where a plaintiff "experienced more than mere social slights and suffered more than mere 'humiliation,' 'ostracism,' and 'bruised ego.'" *Lalaind*, 576 F. Supp. 2d at 1098 (quoting *Yanowitz*, 36 Cal. 4th at 1054, n. 13). The evidence of Progressive's course of retaliation—which includes the denial of a ladder, a refusal to discuss or address the hostile environment Plaintiff perceived, and angry reprimands for reporting problematic behavior to Progressive's HR—could reasonably be found to materially affect Plaintiff's workplace effectiveness "as well as [his] ability to acquire and develop skills to advance up the career ladder." *See id*.

Finally, Progressive's motion fails to argue legitimate explanations for these actions, just as it does in reference to its discriminatory actions. Accordingly, "it is not necessary for the Court to address the additional steps in the *McDonnell Douglas* burden shifting analysis" and summary judgment on Plaintiff's retaliation claims should be denied. *Vincent*, 2012 WL 5929954, at *13; *Alcala*, 2012 WL 6138332, at *15.

## CONCLUSION

For the reasons set forth above, Plaintiff has met his burden of showing issues of fact exist that preclude summary judgment on his harassment, discrimination, and retaliation claims under the FEHA. Accordingly, Progressive's motion should be denied in its entirety.

Date July 10, 2023                    Respectfully submitted,

                                      By:    */s/ Jeffrey Kosbie*
                                      _____
                                      Steven M. Tindall (SBN 187862)

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

Jeffrey Kosbie (SBN 305424)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Tel.: (510) 350-9700
Fax: (510) 350-9701
smt@classlawgroup.com
jbk@classlawgroup.com

*Attorneys for Plaintiff John Doe*

**PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**